Per Curiam :
This case was referred to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on June 29, 1966. Exceptions to the commissioner’s report, opinion and findings were filed by plaintiff; briefs were filed by the parties; and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is not entitled to recover an equitable adjustment under the supply contract and the petition is dismissed.
*371 OPINION OP COMMISSIONER*
Maletz, Commissioner:
This suit arises under three contracts plaintiff had with the United States as part of an Air Force program known as Project ZIP for the development and production of high-energy fuels for use in aircraft propulsion systems. The three contracts involved were (1) a fixed-price supply contract (with price redetermination features) calling for delivery of stated quantities of high-energy fuel, which, it was understood, would be produced at a company-owned plant to be built by plaintiff at its own expense; (2) a cost-reimbursement facilities contract for the design and construction of an Air Force 5-ton per day high-energy fuel production plant; and (3) a cost-plus-fixed-fee operating contract under which plaintiff was to perform the essential production engineering, personnel training, start-up and operation of the Air Force production plant.
Plaintiff filed administrative claims under the disputes clause of these contracts seeking (a) reimbursement of some $1,600,000 under the facilities and operating contracts for design and pre-production work which it claimed to have performed at its company-owned plant for the benefit of the Air Force plant, and (b) an equitable adjustment of approximately $1,000,000 under the supply contract for the increased cost of producing fuel at the company-owned plant, which increased cost, it contended, was occasioned by the unanticipated need for developing in that plant re-design and related production engineering data for the Air Force plant. The claims were denied by the contracting officer whose decision was affirmed on appeal by the Armed Services Board of Contract Appeals (ASBCA No. 6565).
Plaintiff has filed an assignment of errors in which it claims that the Board’s decision is erroneous; that the decision centered around a question of law (i.e., contract interpretation) and thus is not final under the standards of the Wunderlich Act; and that a number of the Board’s *372 factual findings are contrary to the undisputed evidence. Against this background we turn to the facts as they appear in the record before the Board.[1] See e.g., Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 757, 345 F. 2d 833 (1965).[2]
Project ZIP was a high-priority program for the development and production of high-energy boron-based fuels for use in aircraft propulsion systems. Plaintiff’s participation in the program began in 1952 when it entered into a research and development contract with the Navy which initially had *373 responsibility for the program. In performing that contract, plaintiff, in tlie latter part of 1952, took over from another contractor management of a government-owned pilot plant, known as the “Malta” plant, and operated it for the next two and one-half years. The Malta plant produced limited quantities of an elementary high-energy fuel (HEF) which was used for testing and experimentation on both the fuel and engines. At the same time, operation of this plant yielded engineering and production data. The Malta plant had a 3-pound per day capacity of a feeder material known as diborane and utilized a production process known as a “batch” process.[3] This process involved a complete cycle of production which exhausted the raw materials and required at the end of each cycle a new start-up for. each batch.
By 1955 plaintiff developed and placed into production, under a Navy contract, a 40-pound per day pilot batch plant which produced a more advanced HEF. After much experimentation a continuous process method for producing HEF-2 and more advanced fuels (later designated as HEF-3 and HEF-4) was foreseen as a technological possibility. The continuous process method was one in which by-product materials could be re-used, and for which the raw materials required were readily available.
In 1955, in response to a.Navy request, plaintiff laid out a program for scaling-up continuous process production by proposing to build a 250-pound per day pilot plant and then ultimately a government facility with a 5-ton per day capacity.[4] The Navy did not approve this program but instead authorized plaintiff to construct, under a research and development contract, a 40-pound per day continuous process pilot plant as a government facility. (This plant was completed and placed in operation in 1956.)
Meanwhile, as the need and promise for high-energy fuels increased, the Air Force participated actively in. the funding of the Navy program. Also, it was decided that beginning *374 July 1, 1956, the Air Force would assume sponsorship of continuous process development, while the Navy would continue sponsorship of batch process development.[5] It was decided, too, that pending formal transfer of the continuous process program to the Air Force on July 1, 1956, proposals for further work on that program were to be negotiated and awarded by the Air Force preceding formal transfer of the program.
In this context, plaintiff, in the early part of 1956, submitted to the Air Force its two outstanding proposals in connection with the continuous process program. One proposal was for a contract to continue the research and development work on high-energy fuel for fiscal year 1957, including engineering and start-up of a 5-ton per day government-owned production plant (sometimes referred to as the “Air Force plant”); the other proposal (B-999, dated February 1, 1956) was for a facilities contract to design and construct the Air Force plant using the continuous process.
During negotiations on these proposals with the Air Force, plaintiff again urged construction of a 250-pound per day pilot plant as a necessary interim step in the scale-up process before construction of the Air Force 5-ton per day plant.[6] Air Force personnel indicated that appropriated funds were not available for the construction of an interim pilot plant and told plaintiff that if it desired to build a larger pilot plant, it could do so at its own expense and amortize the cost thereof from the proceeds of a fuel supply contract since “procurement money” as distinguished from “facilities money” was available to purchase fuel, and large quantities *375 of HEF-2 were deemed to be necessary for the constantly stepped-up testing program.[7]
In light of these considerations, the Air Force, in April 1956, requested proposals from five prospective suppliers for the supply of 73,230 pounds of borane-based fuels meeting-prescribed specifications. Proposals were submitted by two firms — plaintiff and a company doing parallel development work on the batch process. Plaintiff’s proposal, submitted on May 1, 1956, was “to supply the * * * Air Force * * * 73,230 lbs. of high-energy fuel (* * * HEF-2) from a company-owned plant to be constructed on company-owned land at Niagara Falls, N.Y.” The proposal stated that plaintiff had proposed to the Navy that a 250-pound pilot plant be built as the next logical step in a development program which had as its objective the construction of a prototype plant for the production of high-energy fuels; that this 250-pound pilot plant would be large enough to yield necessary supplemental engineering data for the safe scale-up to larger plants and would also afford the opportunity to gain valuable operation experience; that this 250-pound per day pilot plant was not approved; and that “[bjecause of the pressing needs of the Air Force, and other branches of the Services, for high-energy fuels of the boron hydride type, and the conviction of this contractor that the proposed pilot plant program should be pursued, Olin Mathieson is willing to finance, build and operate this facility for the benefit of this project as well as other related programs which propose to utilize these high-energy fuels.”
“Although this pilot plant will be operated completely independently of the Air Force sponsored programs presently being proposed for fiscal year 1957,” plaintiff’s proposal continued, “it will supply important engineering data and operating experience without cost to the Eesearch and Development program under project ZIP.” The proposal added that all the equipment in the plant would be the property of the corporation; that no government facilities would be used *376 with, the exception of a few items to be purchased from the Navy; that some company maintenance facilities would be available in support of the program; and that in view of the special requirements for the equipment needed, essentially all would have to be purchased according to engineering design.
Plaintiff further stated in its supply contract proposal that it was proposing a fixed-price type supply contract (at an estimated cost of $86.44 per pound) with price redeter-mination provisions and a maximum redetermined price of $99.41 per pound;[8] that it proposed to amortize its investment in this pilot plant over a period of five years, using the sum of the digits methods; that future contracts with the Air Force which extended beyond the first year of operation of the plant would properly recognize the decrease in the unit price of fuel resulting from the application of the S.O.D. method of depreciation; that this plan was considered necessary in view of the uncertain future requirement for production from “this small plant;” that it “is expected that other requirements will develop later in connection with the current interest of the Air Force and other branches of the Services in solid propellants based on boron hydride compounds;” that the “proposed pilot plant can be revised'so as to produce experimental quantities of these solid rocket fuels;” and that this “was an important consideration in * * * [our] decision to make the substantial investment required to build this plant.” It stated that construction of the plant could be completed within seven months from date of receipt of contract; that delivery of fuel could be completed within eighteen months from the date of receipt of the approved contract; that it could supply the key engineering and operating personnel required for the proposed pilot plant without interfering with performance of other defense contracts; and that it could supplement this experienced personnel by trans *377 fers from within the corporation, and by recruitment of local personnel.
Following submission of its supply contract proposal, plaintiff, on May 7, 1956, submitted to the Air Force (i) a program proposal and budget for development of high-energy fuels in fiscal year 1957, and (ii) a proposal for the purchase, erection and installation of government-owned facilities for fiscal year 1957 to be used in support of its proposal for the development of high-energy fuels in that year. In its program proposal, plaintiff advised the Air Force that in order to avoid delay of the pilot plant phase of the program, it was “undertaking with its own funds, the construction of a major pilot plant unit to confirm certain engineering data for the [Air Force] 5 T/D' plant” at an estimated expenditure of company funds of $3,600,000. In the concurrent facilities proposal, plaintiff stated that it was “preparing to invest its own funds in a company-owned pilot plant to meet urgent requirements of the Air Force for high energy fuels;” that “this plant * * * will confirm certain engineering data for the [Air Force] 5 T/D plant;” and that a “proposal to supply HEF-2 from this plant also has been submitted * * * under date of 1 May 1956.”
On May 24, the Air Force advised plaintiff that a decision had been made to construct the proposed Air Force 5-ton per day production plant at a government-owned site near Lewiston, New York. Plaintiff then submitted to the Air Force, on June 1, 1956, its proposal (NF-6046) amending its previous proposal of February 1, 1956 (B-999) for construction of the Air Force plant. 'This was followed on June 15, 1956 by a letter contract (which was later superseded by a definitive agreement) providing for the design and construction of the Air Force plant under a cost-reimbursement contract which was estimated to total $33,005,000. This contract (AF 33 (600)-33060), which is sometimes referred to as the “facilities contract”, is one of the three contracts upon which the present suit is based. (Pertinent extracts are reproduced in Appendix B.)
A few days later, on June 20, 1956, plaintiff and the Air Force entered into a negotiated fixed-price supply contract (with price-redetermination provisions) at a price substan *378 tially higher than that quoted by the competing supplier, but with an earlier delivery schedule. Under the contract, delivery was to be made at stated intervals of 63,593 pounds of HEF-2 at a unit target price of $74.85 per pound and a total target price of $4,759,936.05, with a maximum revised price upon price redetermination of $95.70 per pound and a total maximum revised price of $6,085,850.10. The contract (AF 33 (600)-33407), which is sometimes referred to as the “supply contract”, is the second of the three contracts on which plaintiff’s suit is predicated. (Pertinent extracts are reproduced in Appendix A.)
On October 8, 1956, plaintiff and the Air Force entered into a cost-plus-fixed-fee research and development contract (in the amount, as amended, of some $21,000,000) for the purpose of obtaining data required for the engineering, design and operation of the Air Force 5-ton per day production plant. (This contract (AF 33 (600)-33920) is not directly involved in the present suit,)[9]
In March 1958, plaintiff and the Air Force entered into another contract which is the third contract involved in the *379 suit. This was a letter contract (which, was later superseded by a definitive agreement) calling for the operation by plaintiff of the Air Force 5-ton per day production plant on a cost-plus-fixed-fee basis.[10] The contract required plaintiff (i) to furnish and deliver to the government a specified amount of high-energy fuel within four months after acceptance by the government of the plant, and (ii) to perform pre-production work necessary for the production of the fuel, including recruitment and training of personnel; pre-production raw materials; pre-production engineering; plant start-up; and operation of a prototype electrolytic cell.[11] This contract (AF 33 (600)-35077) is sometimes referred to as the “operating contract”. (Pertinent extracts are reproduced in Appendix C.)
In the meantime, pursuant to the facilities contract, plaintiff, in 1956, began construction of the Air Force 5-ton per day plant.[12] One area of the plant was completed and start-up procedures commenced in January 1959, with other areas being prepared sequentially for start-up as construction was completed. However, in August 1959 — two weeks prior to the scheduled full start-up of the plant — the facilities contract and the operating contract were terminated for the *380 convenience of the government in an abrupt curtailment of the high-energy fuel program.[13]
Concurrently with construction of the Air Force plant, plaintiff, in furtherance of the supply contract, began construction, in June 1956, of its company-owned plant having a capacity of 500 pounds per day of diborane (rather than 250 pounds per day as had been proposed at an earlier date). The plant — a continuous process one — was substantially completed in March 1957. Production began on completion and continued with interruptions until May 1959 when the last shipment under the supply contract was made. Upon completion of these shipments, the plant was shut down due to the government’s curtailment of the high-energy fuel program.
Plaintiff encountered difficulties in the start-up and operation of its company-owned plant, most of which were of a mechanical nature, involving design, maintenance, process, lay-out, material and unexplained problems. The problems thus encountered consisted in essence of the full gamut of problems usually found upon beginning production in a newly constructed, complicated chemical plant.[14] In these *381 circumstances, plaintiff incurred costs in the construction and operation of the company-owned plant which were in excess of the target costs provided for in the supply contract under which the fuel was being produced.[15] After completion of the supply contract (in May 1959), proceedings for redetermination of the contract price followed, as a result of which plaintiff was paid the ceiling price under the contract rather than the target price.[16] However, receipt of the ceiling price did not result in recapture of all the costs incurred by plaintiff in constructing and operating the plant.
In October 1960 (some 15 months after completion of the supply contract and after the amount payable under that contract had been paid in full), plaintiff asserted for the first time the claims involved here. It claimed that under the terms of the cost-reimbursement facilities contract it was entitled to reimbursement of $792,981 for costs incurred at its company-owned plant in designing equipment for the Air Force 5-ton per day plant; and that under the terms of its cost-plus-fixed-fee contract to operate the Air Force plant, it was entitled to reimbursement of $814,332 for costs incurred at the company-owned plant in achieving improvements in process for the benefit of the Air Force plant. Plaintiff, in addition, sought an equitable adjustment of $1,024,637 under the changes clause of the supply contract on the ground that the government by its actions accelerated *382 tbe work under the supply contract or caused it to be performed under conditions unanticipated by the parties so as to entitle it to a compensable change.
In June 1961, the contracting officer denied the claim and made the following findings: “It is my determination that no basis exists for allowance of any portion of such claim, and you are hereby advised that such claim and all costs set forth in your letter of 13 October 1960 are disallowed. Yo-ur claim is premised on the assertion that the Company Owned Plant at Niagara Falls, New York, was conceived, built, and operated under the dual objective of producing high-energy fuel under Contract AF 33 (600)-33407 and providing engineering study for facility development and construction of the Air Force plant at Model City, New York, mider Contract AF 33 (600)-33060, as well as the production therein of high-energy fuel under Contract AF 33 (600)-35077. Based upon a careful review of all available information including conferences with representatives of your firm, I am unable to concur with that assertion. Activities conducted in the Company Owned Plant were directly and necessarily associated with production under fixed price re-determinable Contract AF 33 (600)-33407.”
Upon appeal, the ASBCA, after hearing, affirmed the contracting officer’s decision.
I

The Gost Allowance Claims

With respect to the claims for reimbursement under the facilities and operating contracts for design and pre-production work said to have been performed at the company-owned plant for the benefit of the Air Force plant, the Board found that the government knew plaintiff planned to use its company-owned plant for a dual purpose; that plaintiff’s offer to bujld and operate a plant which would be useful for the facilities and engineering work for the Air Force production plant strongly influenced the government’s decision to award the supply contract to plaintiff at a fuel price higher than obtainable elsewhere; that this knowledge and action on the *383 part of the government was based upon plaintiff’s proposal to build and operate a plant at no expense to the government; and that the costs plaintiff sought to have reimbursed would represent an expense to the government occasioned by the building (including design) and operation (including pre-production, engineering and operation) of plaintiff’s company-owned plant. The Board stated that it is not unusual for contractors engaged in and intent upon becoming the key contractor in a vast procurement to share in the early costs by one or more cost-sharing arrangements;[17] that it would appear that the series of interrelated contracts involved in the appeal were intended to accomplish that result; that the plan went awry only because plaintiff’s (and possibly the govermnent’s) estimates and expectations of the longevity of the program proved to be too optimistic; that no one expected that circumstances would arise which would make it necessary to close down the Air Force plant a week or two before it started up production; that this close-down also signaled the end of any large-scale supply of fuel from the company-owned plant; that since plaintiff planned to amortize the cost of the company-owned plant over a 5-year period, and since production ceased in about two years, plaintiff’s share of the costs undoubtedly became more than *384 plaintiff bad intended, tliougb tbe intent to share tbe cost was not altered.[18] Tbe Board continued:
Tbe final question is what share did the parties intend to be borne by * * * [plaintiff]. Tbe answer lies in the proposals made by * * * [plaintiff], quoted above, which, as * * * [plaintiff] says, were incorporated into tbe contracts. * * * [Plaintiff] offered and agreed to (1) “finance,” (2) “build” and (3) “operate” the * * * [company-owned] plant. It warranted that such operation would be “completely independent” of tbe engineering services work. It offered to supply “engineering data” and “operating experience” from the * * * [company-owned] plant “without cost.” In these terms, we find that * * * [plaintiff] offered and agreed to pay in full, from its own funds, for all of the activities performed at the * * * [company-owned] plant (subject only to recapture from profits of fuel sales) irrespective of benefits accruing to the Government HEF program. Accordingly, the * * * [plaintiff] is not entitled to charge any or the costs incurred at the * * * [company-owned] plant to either the facilities or the engineering services contracts, and the appeal must be denied in this respect.
Plaintiff contends that this quoted conclusion of the Board is erroneous. It says that the Air Force agreed to pay for design and pre-production engineering for the Air Force plant; that no limitations were stated or imposed on where the work could be performed; and that there was no warranty or guaranty by plaintiff in the facilities, operating or supply contract that the design and engineering costs incurred in the company-owned plant for the benefit of the Air Force plant would be at plaintiff’s expense. In all this, plaintiff emphasizes that the Air Force knew that plaintiff intended to and actually used the company-owned plant for a dual purpose — to produce high-energy fuels to meet Air Force re *385 quirements under the supply contract and to confirm engineering data for tbe Air Force plant. While this is borne out by the record, as the Board found, there is nevertheless a basic difficulty with the entire thrust of plaintiff’s argument. The difficulty is that the record before the Board establishes that it was the understanding of the parties on entering into the contracts in question that the cost of the work to be performed at the company-owned plant, including work benefiting the Air Force plant, was to be at plaintiff’s own expense (except as noted in the footnote below) and thus was not to be charged to the cost-reimbursement contract.[19] That this understanding was part of the bargain between the parties is made clear by the circumstances surrounding execution of the contracts[20] and by plaintiff’s consistent actions and course of conduct throughout performance.[21]
As to the surrounding circumstances, there can be no doubt that in its proposals to the Air Force (previously summarized here), which culminated in the contracts in question, plaintiff represented that it would pay in full, from its own funds, for all the activities performed at the company-owned plant, including those benefiting the Air Force plant, *386 subject only to recapture from profits from fuel sales under the supply contract. Thus, in its proposal of May 1, 1956 for a fixed-price supply contract (at a price substantially higher than that requested by the other bidder) plaintiff stated that “ [b] ecause of the pressing needs of the Air Force, and other branches of the Services, for high-energy fuels of the boron-hydride type, and the conviction of this contractor that the proposed pilot plant program should be pursued, Olin Mathieson is willing to finance, build and operate this facility [the company-owned plant] for the benefit of this project as well as other related programs which propose to utilize these high-energy fuels.” It added: “Although this pilot plant will be operated completely independently of the Air Force sponsored programs presently being proposed for fiscal year 1957, it will supply important engineering data and operating experience without cost to the Research and Development program under project ZIP.” And a few days later (on May 7, 1956) in its proposal submitted to the Air Force for a program and budget for development of high-energy fuels for fiscal 1957, plaintiff reiterated that it was “undertaking with its own funds the construction of a major plant unit [the company-owned plant] to confirm certain engineering data for the [Air Force] 5 T/D plant.” Further, in its concurrent facilities proposal submitted on the same date, plaintiff informed the Air Force that it was “preparing to invest its own funds in a company-owned pilot plant to meet urgent requirements of the Air Force for high-energy fuels;” and that “this plant * * * will confirm certain engineering data for the [Air Force] 5 T/D plant.”
It was in the setting of these representations that the supply and facilities contracts were executed in the following month (June 1956) and the operating contract in March 1958. The operating contract, moreover, was a direct outgrowth of a proposal plaintiff submitted to the Air Force in December 1956 in which it requested favorable consideration for that proposed contract on the ground (among others) that it had a very considerable investment in the program, in which connection (it stated) it had undertaken construction of an intermediate-size company-owned pilot plant that would cost approximately $3,600,000 “to advance the pro *387 gram more rapidly toward production and use goals” and that “the foregoing activities have entailed a large-scale and long-term involvement of company funds. * * *” See note 10, supra.[22]
Plaintiff’s consistent course of conduct throughout performance of the contracts is further indication of the parties’ understanding on entering into the contracts that the cost of work performed at the company-owned plant was to be at plaintiff’s expense and was not to be charged to the facilities or operating contracts. For example, in performing the contracts, plaintiff submitted monthly written progress reports to the Air Force; once a month plaintiff’s representatives met with Air Force representatives to discuss each phase of the activities at the company-owned and Air Force plants, including all aspects of engineering, design, procurement, construction, operations, and required approvals; plaintiff’s representatives made periodic visits to Air Materiel Command headquarters at Wright Field to discuss activities and work performed at the two plants; twice a year plaintiff’s representatives met for a full day or two with the Joint Working Group on Special Fuels (a civilian group set up by the Defense Department to monitor the high-energy fuels program) and made comprehensive and detailed reports concerning the work performed and activities at the plants. Despite all this, in no instance did plaintiff’s representatives ever intimate to the Air Force or the Joint Working Group that any of the costs involved in the present claims were to be charged to the facilities or operating contracts.
In addition, under both the facilities and operating contracts, provision was made for monthly payments to plaintiff for costs incurred by it as work progressed. Notwithstanding such provision for payment, notwithstanding that the company-owned plant was set up as a separate and dis *388 tinct operation for costs purposes, and notwithstanding that plaintiff was apprised of and concerned with the substantial costs and expenditures that were being incurred at its company-owned plant, plaintiff at no time during performance of the cost-reimbursement contracts requested any payment whatever under such contracts for the costs presently claimed — all of which were incurred at the company-owned plant.[23] Indeed, it was not until some 17 months after the supply contract was completed and some 14 months after the cost-reimbursement contracts were terminated, before plaintiff, for the first time, asserted the present claims. Nor can it be overlooked that when plaintiff, upon completion of the fixed-price supply contract, submitted to the Air Force its costs under that contract for price redetermination purposes, it included all costs of the company-owned plant, including those contained in the present claims.
We turn next to a more detailed consideration of the two cost-reimbursement contracts involved here and to each of plaintiff’s specific contentions. First, as to the facilities contract, it is to be noted that clause 2 of the general provisions of that contract, in conjunction with item 1 of the “Items of Work” provision of the contract schedule, required the prior written approval of the contracting officer for performance of the items of work set forth in the schedule, such as the design and construction of the high-energy fuel facilities, with the qualification that the contracting officer, in his discretion, could grant such approval subsequent to performance.'[24] This provision and the provision of “Items of *389 Work” were in effect until June 16,1958, at which, time item 1 was revised in part, but still maintained the requirement for the written approval of the contracting officer.[25] Not only was there no prior request by plaintiff for approval of the performance of the work which, is presently the basis for plaintiff’s claim under the facilities contract, it was not until over a year after the work was completed that plaintiff gave notice of this work through its filing of an administrative claim with the contracting officer.
Plaintiff insists, however, that the facilities contract authorized it to develop, at government expense, design data in the company-owned plant for the benefit of the Air Force plant. It states that in its original proposal (B-999) which was incorporated by reference into the facilities contract, it *390 pointed out that in order to accomplish the design of the Air Force plant, further “pilot plant work” was required.[26] Plaintiff further states that in its amended proposal (NF-6046, dated June 1, 1956),[27] which was also incorporated by reference into the facilities contract, it defined its responsibility “under the terms of the proposed prime contract with the Air Force” as requiring it (i) to “develop through its research, engineering and pilot plant operating personnel, process data * * * [including] preliminary designs for special equipment developed by [plaintiff] from experience in pilot plant operations;” and (ii) to “study problems concerning materials of construction, yields, and * * * [to] initiate designs for special equipment after preliminary studies are started.” Plaintiff asserts that this clearly demonstrates “that the parties intended the work to be done by * * * [plaintiff] under this * * * [facilities] contract and to be reimbursed thereunder for any costs under the terms of that same contract. * * *”
There are several flaws in the argument, however. In the first place, it is significant that plaintiff’s proposal NF-604:6 makes no reference whatever to any work to be performed in the company-owned plant. This is to be contrasted with plaintiff’s proposal NF-6430 for the October 1956 research and development contract for the Air Force plant in which plaintiff specifically advised the Air Force that the time its engineers spent 'at the company-owned plant in obtaining engineering and operating data for the Air Force plant would be a direct charge under the proposed research and development contract. See note 9, supra. By a parity of reasoning, it would seem that had plaintiff intended its facilities contract proposal to include work at the company-owned plant, its proposal would have specifically so stated— as it did in the case of the 1956 proposed research and development contract. Secondly, even if the facilities contract were considered to be sufficiently broad in scope to authorize work at the company-owned plant, written approval of the *391 contracting officer would still have been required for such work to the extent that it was to be cost-reimbursable.' As previously indicated, no such approval was ever requested or granted.
Plaintiff further argues that the Air Force specifically authorized plaintiff to develop re-design data for the Air Force plant without any cost limitation. It states that upon start-up of the company-owned plant in 1957 many unanticipated mechanical difficulties with continuous process equipment of commercial size were encountered; that by March 1958 it was apparent that a major re-design program would be required; that in mid-March 1958, plaintiff wrote to the Air Force asking for an increase in the amount of $962,600 under the facilities contract to “cover the costs incurred by the Design Development Group in preparing the process data for the project and supervising the work of the four A and E subcontractors;” and that in accordance with plaintiff’s request the facilities contract was amended on June 16, 1958 by Supplemental Agreement No. 1 which added to part 6 of the schedule a provision that the “funds allotted to this contract for the performance of Item 1 of Part 1 of the Schedule will be increased * * * in an amount sufficient to cover the Government’s obligation to reimburse the Contractor for the cost of facilities and work approved by the Contracting Officer.” Plaintiff further states that it later ascertained it needed still further additional facilities and in March 1959 requested a further increase in the estimated cost for the Air Force plant in the amount of $1,225,-988, pointing out that on the basis of experience in the company-owned plant additions of prescribed equipment were needed in the Air Force plant. It observes that the funds to cover these additional facilities for the Air Force plant were added to the contract by a change order issued in April 1959. Plaintiff maintains that the approval of the added facilities “with an open-end allotment of funds sufficient to cover the design and acquisition of the required equipment, whatever amount that might be, constituted a recognition by the Air Force that the scope of the re-design could not then be precisely estimated but the re-design effort should be pressed whatever the cost.”
*392 The inference from this argument, it appears, is that execution of the supplemental agreement and change order constituted approval by the Air Force for payment to plaintiff under the facilities contract for costs incurred at the company-owned plant. The argument is vitiated, however, by plaintiff’s own contemporaneous construction of these modifications, as shown by its course of conduct. See e.g., Minneapolis-Moline Co. v. United States, 137 Ct. Cl. 790, 795, 149 F. Supp. 146, 149 (1957). For at no time during performance did plaintiff ever suggest to the Air Force that the added funds under the facilities contract would be expended at the company-owned plant; nor did plaintiff ever request Air Force approval to expend such funds in that way. Supplemental Agreement No. 1, to which plaintiff refers, resulted from a revised estimate plaintiff submitted to the Air Force in March 1958 in which it indicated that $46,547,454 would be required for completion of the Air Force plant rather than $33,005,000 as originally estimated. See note 12, supra. Nowhere in the lengthy revised estimate and detailed cost breakdown was there any indication that work performed or to be performed in the company-owned plant was to be included. The change order issued in April 1959, to which plaintiff makes reference, resulted from a later estimate and supporting documentation submitted by plaintiff to the Air Force in March 1959 in which it advised (i) that an additional $1,225,988 was required to complete the Air Force plant, and (ii) that as a result of operating experience in the company-owned plant, the addition of certain specified equipment in the Air Force plant was needed. Again, neither the estimate nor the supporting documentation contained any suggestion that work at the company-owned plant would constitute a reimbursable cost under the facilities contract. To the contrary, on several contemporaneous occasions plaintiff indicated to the Air Force — as it had in its original proposals — that the cost of constructing and operating the company-owned plant was at the plaintiff’s own expense.
For example, following start-up of the company-owned plant, plaintiff reported to the Defense Department’s Joint Working Group on Special Fuels, at a meeting on October 29 *393 and 30,1957, that the company-owned plant “was designed, constructed and financed by Olin Mathieson at a cost of 5.5 million dollars”; that “[i]ncluded in this expenditure are the costs required by a crash program”; that “[r]esults of the operating experience gained at [the company-owned] plant have been passed on for inclusion in the * * * [Interim Pilot Plant (see note 5, supra) ] and 5 T/D Air Force Plant Designs”; that as a result of the experience gained at the company-owned plant, various changes were made in the Air Force plant, such as modification of process flow sheets, improved reactor designs, improved compressor design, improved pentaborane recovery, improved plant layout, etc.; that “[additional improvements, simplifications and modifications will be made as * * * [the company-owned plant] continues to operate”; and that “[t]hese improvements will also be funneled into the operation of the Navy and Air Force plants.” And as late as April 15, 1959, in submitting a proposal for continuation of the high-energy fuels development program it was conducting under the research and development contract, plaintiff advised the Air Force that it had made available for the project a total of approximately $3,400,000 of its own money. It further stated: “In addition, Olin Mathieson has completed and placed in operation a new company-owned pilot plant at an investment of more than $5,800,000. Depreciation on this plant is not reflected in the overhead rate for research. This plant can function as a small production facility and provide pilot plant operating information and some training experience for engineers and operating personnel as well. The operation of this pilot plant also could make possible the confirmation of certain engineering design information and operating data needed in the ‘production engineering’ and start-up phase of the 5 T/D plant now nearing completion * * * under the [facilities] contract.”
In further support of its contention that the cost of development at the company-owned plant is allowable under the facilities contract, plaintiff asserts that the company-owned plant was the only pilot plant at which certain data could be developed under the facilities contract. Plaintiff refers to four meetings at which this position was made *394 known to the Air Force, which meetings took place on October 29-30, 1957, the spring of 1958, September 24,1958, and January 23,1959. However, in each case contemporaneously or shortly thereafter, plaintiff made statements or submitted proposals which omitted any suggestion that the work at the company-owned plant was reimbursable under the facilities contract. Thus, at the meeting on October 29-30, which took place with the Joint Working Group, plaintiff (as previously noted) informed that group that it was financing the cost of constructing and operating the company-owned plant. With respect to the meeting in the spring of 1958 (which is not more specifically identified as to time), plaintiff in March 1958 (as has also been noted) submitted a revised cost estimate for the Air Force plant that contained no request for reimbursement under the facilities contract for work performed at the company-owned plant. The meeting in September 1958 to which plaintiff refers was followed by a proposal by plaintiff dated October 16, 1958 (see note 14, sufra) which stated that plaintiff had invested $10,000,000 of its own money in solving a number of problems pertaining to the manufacture of boron fuels and that the experience gained from the company-owned plant had been used in the design of the Air Force plant. Absent from that proposal was any indication that the Air Force was liable under the facilities contract for the costs thus incurred at the company-owned plant. The meeting of January 23,1959 was followed by plaintiff’s proposal of March 1959 which (as stated before) sought an additional $1,225,988 due to changes in scope in'the Air Force plant and advised that specified changes were based upon experience gained in the company-owned plant, but made no request for cost reimbursement for work performed there.
We come now to the operating contract. Plaintiff contends that the Air Force agreed to pay for pre-production engineering for the Air Force plant under that contract, insisting that its contract proposals (B-999 in February 1956 and NF-6951 in December 1956) provided for pre-production engineering to be done in pilot plant facilities and that the operating contract expressly authorized pre-production engineering at government expense without limiting plain *395 tiff’s choice of a work site. As pointed out before, however, the proposals of plaintiff which led to the operating contract make clear that work at the company-owned plant would be at plaintiff’s expense. Moreover, the operating contract provided that the government’s obligation would be limited to the ceiling price and specifically included as an allowable cost at the company-owned plant only the cost of operating the prototype cell therein for a maximum period of six and one-half months. Failure of the operating contract, in these circumstances, to include as an allowable cost other work performed in the company-owned plant provides additional indication of the parties’ understanding that such work was not to be cost-reimbursable.
Plaintiff further argues that the parties contemporaneously interpreted the operating contract as covering production engineering work to be performed in pilot plant facilities and specifically in the company-owned plant. It states in this connection that in authorizing use of a cost-plus-fixed-fee type of contract, the Air Force found that improvisation and change were an essential aspect of the work required under the contract and that there was thus manifested an intention by the parties to grant plaintiff broad latitude within the defined work and cost objectives. However, in the same findings the Air Force referred to the desirability of placing the contract with a source which had already made a substantial initial investment (plaintiff’s investment in the company-owned plant).
Plaintiff maintains, in addition, that before the present controversy arose over the particular claims involved here under the operating contract, the Air Force specifically interpreted that contract as covering pre-production engineering costs incurred in the company-owned plant and specifically acknowledged that such work performed in that plant was included within the scope of the operating contract so that no contract modification was necessary. The factual background for this argument is set out in note 14, svkpra. In summary, it is this. In the early fall of 1958, plaintiff advised the Air Force that it anticipated difficulty in meeting the production schedule forecast for the Air Force plant and that more pilot plant work was necessary if the schedule was *396 to be met. In. these circumstances, plaintiff recommended that the supply contract be terminated and that the company-owned plant be used primarily for pilot plant work under a cost-plus-fixed-fee contract. The proposal was rejected by the Air Force which determined that it was unnecessary to terminate the supply contract to accomplish the support work necessary for the Air Force plant. Plaintiff then submitted a revised proposal (OM-183-1) for a development support program for the Air Force plant in which it recommended performance of seven technical tasks, some of which it indicated would be performed in the company-owned plant without hindering production in that plant. Plaintiff’s proposal was authorized (with minor modifications) by the Air Force which wrote plaintiff in December 1958 that the “above authorized work is considered within the scope of * * * [the operating contract]that since under the proposal (OM-183-1), “no work over and above contractual requirements is contemplated, no fee other than that alrea'dy specified can be paid on these tasks as quoted by contractor in subject proposal”; and that “[s]ince no contractual changes are necessary, contractor should proceed in these areas at the earliest possible date.” [28]
Plaintiff says that authorization by the Air Force of plaintiff’s proposal OM-183-1, without any contractual change or amendment, constituted a contemporaneous construction of the operating contract as including authorization to do pre-production engineering in the company-owned plant. The short answer is that if the parties construed the operating contract as already authorizing pre-production engineering at the company-owned plant, plaintiff’s proposal OM-183-1 would have been entirely unnecessary. Approval of the proposal in these circumstances thus constituted an exception to the understanding of the parties on entering into the operating contract that work performed at the company-owned plant was to be at plaintiff’s own expense.
For the reasons stated, it is concluded that plaintiff is not entitled to charge any of the claimed costs incurred at the *397 company-owned plant to either the facilities or operating contract. The decision of the Board dismissing the cost-allowance claims must, therefore, be affirmed.
II

The Changes Claim,

Plaintiff further challenges as erroneous the Board decision denying its claim for an equitable adjustment of $1,024,637 under the changes clause of the supply contract for the increased cost of producing fuel at the company-owned plant, which increased cost, it contended, was occasioned by the unanticipated need for developing in that plant re-design and related production engineering for the Air Force plant. Before the Board plaintiff argued that at the time of the negotiation of the supply contract the parties mutually assumed that the design confirmation work for the Air Force plant could be obtained from the company-owned plant without significant interference with production of fuel at the company-owned plant; that in March 1958 after the company-owned plant was started up, an unanticipated major re-design effort at that plant became necessary to develop re-design data for the Air Force plant which interfered with the orderly production of fuel and thereby changed the contemplated method of performance; and that despite these considerations the Air Force unreasonably delayed granting two requested extensions of time[29] thereby exerting continuing pressure on plaintiff to expedite deliveries from the company-owned plant.
Alternatively, plaintiff argued before the Board that the mutual assumption of the parties on which the contract was based proved wrong; that a change in the performance required had occurred; and that this entitled plaintiff to an equitable adjustment under the changes clause.
The Board rejected the first of plaintiff’s arguments, stating:
* * * Under the special facts of this case, we are not prepared to find as a fact that 3-4 months was an un *398 reasonable interval within which to respond to * * * [plaintiff’s] requests. The entire climate of this procurement was such that the * * * [plaintiff] is chargeable with knowledge that the requested extensions of time and the granting thereof were but ministerial formalities. * * *
* * * [Plaintiff] 'has not offered any direct evidence of any direct action by the Government which called for acceleration of fuel deliveries. It argues that expressions of urgency concerning the construction schedule of the 5 T/D plant (under the facilities contract) required accelerated elimination of production problems in the * * * [company-owned] plant which in turn hampered orderly production of fuel. Such expressions of urgency were not accompanied by threats to terminate the facilities contract. We do not find from this evidence acceleration of the work under the supply contract at the direction of the Government. Nor has the * * * [plaintiff] shown us what work was actually accelerated.
We find that any urgency and consequent acceleration of the supply contract work were solely the product of * * * [plaintiff’s] volition. We do not believe that any reasonable contractor under the same circumstances would or should have considered himself coerced into acceleration of the work by concern over a termination for default of either contract. We find that the Government did not accelerate the work and the appeal must be denied in this regard.
As to the alternative argument advanced by plaintiff to the effect that a change resulted from the performance of work under the supply contract under conditions unanticipated by the parties, the Board said:
$ $ * * [W]e t 'plaintiff * [plaintiff hink the fatal flaw in this claim is. that has failed to demonstrate _ that the was under a contractual obligation or a Government order to perform its research and engineering work in the * * * [company-owned] plant. This was * * * [plaintiff’s] own idea from the first. It was an idea that was not acceptable to either the Navy or the Air Force as long as the expense of building and operating a larger pilot plant would be a direct charge to the Government. Hence, whatever excess raw materials were used by the * * * [plaintiff] due to the nature of the work it performed in the * * * [company-owned] plant, resulted not from any change in the Gov *399 ernment’s anticipation, but solely from non-fulfillment of * * * [plaintiff’s] expectations.
The Board added that considerable doubt was cast upon what plaintiff’s anticipations were, and whether the 83 percent operating factor it estimated as reasonable for start-up of the company-owned plant was appropriate. The Board continued:
* * * [Plaintiff] planned and chose to perform “essentially experimental and developmental work” in a facility it constructed to produce HEF making and using as a feeder material 500 lb./day of diborane. It has not satisfied us that an efficiency factor applicable to the start-up of a new production facility (83%) is or should be applicable to either a pilot plant or the type of work * * * [plaintiff] undertook in the * * * [company-owned] plant. Thus, in our opinion, aside from the question whether the Government ordered a change, we do not have satisfactory proof that there was a change, ordered or unordered.
At all events, * * * [plaintiff] failed to prove an element essential to its claim that the Government changed its contract, viz., that the Government directed the experimental and developmental work to be performed in the * * * [company-owned] plant. * * * To show only that the Government had knowledge of * * * [plaintiff’s] activities is not enough. * * *
Accordingly, we find that the Government has not changed the provisions of the supply contract, and * * * [plaintiff] must fail on this issue also.
Plaintiff insists that these findings are erroneous and argues here (as it did before the Board) that it is established by the record that the parties mutually assumed, at the time the contracts were negotiated, that the dual purposes of the company-owned plant were compatible, and the design confirmation would be a “fall-out benefit” of the company-owned plant operation with no resulting interference with production; that the parties recognized that a change in the circumstances of performance had resulted because off the need beginning in March 1958 to develop re-design data in the company-owned plant for the benefit of the Air Force plant, which development work interfered with the production of fuel; that despite the change, plaintiff was compelled to employ the company-owned plant on the original dual *400 purpose basis; and that the Air Force accelerated the work by unreasonably delaying in granting two requests for time extensions. For the reasons that follow, I cannot agree.
In the first place, the record fails to bear out the essential premise of plaintiff’s claim that the parties mutually assumed that the Air Force plant design would require only confirmation work in the company-owned plant and that such work would not interfere with fuel production at the latter plant. What the record shows is this. When the high-energy fuel program was under Navy auspices, the Navy did not approve plaintiff’s proposal to build an intermediate 250-pound pilot plant as a forerunner to a 5-ton per day production facility. When the Air Force took over sponsorship of the continuous process program, it advised plaintiff that appropriated funds were not available for construction of an interim pilot plant and told plaintiff that if it desired to build such a plant, it could do so at its own expense and amortize the costs thereof from the proceeds of a fuel supply contract. In these circumstances, plaintiff submitted its proposal for a fuel supply contract in which it advised the Air Force that it was planning, at its own expense, to construct a company-owned plant for the dual purpose of supplying fuel and developing data for the Air Force 5-ton per day production facility. Undoubtedly, this offer by plaintiff to build at its own expense a plant which would not only supply fuel but also provide design data that plaintiff insisted was necessary for the Air Force plant was (in addition to plaintiff’s promise of earlier deliveries than its competitor) a strong motivating factor (as the Board found) for the Air Force’s decision to award the supply contract to plaintiff, even though it was the high bidder.[30] *401 The point is, however, that the entire concept for a dual purpose company-owned plant was plaintiff’s own idea from the very first, but, as the Board said, “[i]t was an idea that was not acceptable to either the Navy or the Air Force as long as the expense of building and operating a larger pilot plant would be a direct charge to the Government.” It may well be that it was plaintiff’s assumption, when it submitted its supply contract proposal, that design work at the company-owned plant for the benefit of the Air Force plant would not interfere with fuel production; but at best this was a unilateral assumption on plaintiff’s part, not a mutual assumption of the parties. And conceding arguendo that plaintiff’s assumption concerning compatibility of the company-owned plant proved to be wrong and that major redesign work became necessary which interfered with fuel production, this was not work which the Air Force directed to be performed in the company-owned plant; it was work which plaintiff performed at its own volition.
Nor does it appear from the record that the problems encountered at the company-owned plant were of an unanticipated nature. On the contrary, the Board found — without challenge — that the problems were of a kind that were to be expected in the construction and start-up of a complicated industrial chemical plant that was the first of its kind. As plaintiff advised the Air Force in June 1958: “At the time the * * * [supply] contract was executed in June 1956, it was recognized by both parties that the Company-Owned Plant constructed to produce the fuels to be supplied was the first of its kind and, therefore, it could be expected that difficulties would develop not only in operating the facility but also in supplying an end product which would meet firm specifications. The Air Force recognized the problem of a new plant and a new product since it was insisted by the Air Force that a contract for the supply of this product contain a cost redetermination provision.”[31]
*402 The record, moreover, fails to establish that the modifications at the company-owned plant — which plaintiff says were started in March 1958 — were occasioned by the need to develop design data for the Air Force plant. It may be noted that in accordance with the provisions of the supply contract (Item 2 of Part I of the Schedule), plaintiff submitted monthly reports to the Air Force on operations of the company-owned plant. There is nothing in any of these reports even remotely suggesting that modifications at that plant were occasioned by the need to develop design data for the Air Force plant (or, indeed, that such modifications had a significant effect on production except in May and June 1958). Thus, plaintiff’s report for March 1958 stated that operations at the company-owned plant continued to show improvement; that many difficulties were encountered and overcome which hampered operations and limited production; that despite the difficulties, production was comparable to that of the previous months; that the problems thus encountered were: failure of an instrument to function properly, which was corrected by installing a modified instrument; a flash fire in a feed section; overpressurization of a feed tank; failing of piping due to overpressurization requiring fabrication and installation of a new separator. The report added that a modification program to increase plant capacity was progressing satisfactorily. The report for April 1958 stated that the operations of all sections of the company-owned plant had shown marked improvements during the month; that new production records had been achieved in each area of the plant; that the modification program was essentially completed during the month; and that in spite of all the problems caused by the phasing in of new equipment, production and shipments were higher than in any previous month. The report for May 1958 stated that all sections of the plant were operated intermittently during the month; that phasing in *403 of the new equipment and adjusting flow conditions were tbe major sources of difficulties encountered and overcome; that all other sections of the plant operated without any major difficulties, and that due to the above problems, shipments were lower than in the previous month. The report for June stated that shipments were higher than in the previous month; that the synthesis section of the plant was operated intermittently during the month due to high feed rates which caused an imbalance of the system; that during the latter part of the month new equipment was phased in at moderate feed rates, and steady conditions were obtained; that production was lost during the last four days of the month due to a strike, and that until the strike was called, all other sections of the plant operated satisfactorily. The reports for July and August 1958 noted that the strike had shut down the plant from June 27-August 9,1958, the report for August adding that the plant was started up on August 18; that feed rates were increased to the equipment limit; that on-stream time increased to above design conditions toward the end of the month; that although the synthesis product parity had increased to above 90 percent, process yields were not in line; arid that the new reactor operation was eminently successful. The report for September 1958 observed that á record production had been achieved with an on-stream time of over 85 percent.[32] ■ Beyond this, it is *404 significant that at no time in the course of performance did plaintiff ever advise the Air Force that fuel production at the company-owned plant was being hampered because of the need to obtain from that plant design data for the Air Force plant. See tr. 143-45; tr. 399.
Plaintiff further attacks as erroneous the findings of the Board that the government did not accelerate the work under the supply contract; that plaintiff had not Shown what work was actually accelerated; that the government’s delay of three to four months in granting extensions to complete the supply contract deliveries was not unreasonable in the circumstances of the case; and that the entire climate of the procurement was such that plaintiff was chargeable with knowledge that the requested extensions of time and the granting thereof were but ministerial formalities. Plaintiff says that on February 11, 1958 [sic], as a result of unanticipated technical difficulties, it requested a time extension for deliveries under the supply contract, which was not granted until May 22, 1958 “bringing extraordinary pressure to bear on * * * [plaintiff] to expedite deliveries to meet Air Force need for the fuel.” It further says that on July 28,1958, because of a labor strike and continuing technical difficulties, it requested a further extension of deliveries, which was not granted by the Air Force for nearly four months, until November 25, 1958, “thereby putting * * * [plaintiff] technically in default and exerting continued pressure to expedite deliveries from COP [company-owned plant].”
In considering these contentions, it will be recalled that plaintiff’s proposal called for delivery of fuel six months earlier than its competitor, and that this was an important factor in the Air Force’s decision to award the supply contract to plaintiff in the first place. More particularly, in accordance with plaintiff’s proposal, the supply contract required completion of all deliveries in December 1957. *405 However, as of December 1957, the total amount of fuel actually delivered by plaintiff was only some 5 percent of the contracted quantity. Several months later, on February 14, 1958, plaintiff advised the Air Force that numerous technical difficulties were encountered in the start-up and operation of the company-owned plant and recommended a revision of the delivery schedule under which 59,238 pounds of fuel remaining to be delivered under the supply contract[33] would be shipped in specified monthly amounts from February to October 1958, with 2,400 pounds to be delivered in February, an equal amount in March, 3,000 pounds in April, and 7,500 pounds in May. Supplemental Agreement No. 2, adding the revised delivery schedule to the supply contract, was executed by the Air Force on May 22, 1958. Despite this delay in the formalization of plaintiff’s request for revision of the delivery schedule, it is clear from plaintiff’s own monthly reports that this had no effect whatever on bringing pressure to bear on plaintiff to expedite deliveries. In fact, plaintiff’s actual deliveries during the period in question were considerably less each month than the amounts proposed in the revised schedule. Thus, in February plaintiff delivered 1,671 pounds rather than the 2,4D0 pounds set out in the proposed new schedule; in March, it delivered 1,508 pounds instead of the proposed amount of 2,400 pounds; in April, it delivered 2,392 rather than the proposed amount of 3,000 pounds; and in May, it delivered 757 pounds as contrasted with the proposed amount of 7,500 pounds. Furthermore, in requesting a later extension of delivery time, plaintiff referred to the February request for schedule revision and approval thereof by the Air Force without suggesting in any way that approval had been delayed, let alone that delay in granting approval had caused it to accelerate deliveries.
As to plaintiff’s claim that further pressure was brought on it to expedite deliveries because its request for extension filed on July 25,1958 was not granted by the Air Force until November 25, 1958, the facts are these. On July 28, 1958, plaintiff requested an extension of the delivery schedule because of technical difficulties and a strike. Under the revised *406 schedule, 1,000 pounds of fuel were to be delivered in September, 2,500 pounds in October, and 4,000 pounds in November. On September 24, 1958, the Air Force approved the shipment of fuel which did not meet the specifications of the contract, and on November 25, 1958 it executed Supplemental Agreement No. 8, adding to the supply contract plaintiff’s proposed revised schedule of July 1958.[34] The record shows that in the interim period September through November 1958 there was a substantial increase in plaintiff’s production and that the amounts of fuel shipped were considerably in excess of the quantities proposed in plaintiff’s revised schedule of July 1958.[35] Thus, in September plaintiff shipped 3,193 pounds as compared with its proposed schedule of 1,000 pounds; in October it shipped 5,389 pounds instead of the proposed amount of 2,500 pounds; and in November it shipped 7,150 pounds as compared with the proposed amount of 4,000 pounds. The record, however, contains no indication that this increase in production was attributable in any respect to pressure being brought to bear upon plaintiff through delay in exechting the formal supplemental agreement or otherwise. Plaintiff’s report for September 1958, for example, noted that the operation of the new thermal reactor had been extremely successful and that no problems were experienced in the alkylation section in which pentaborane was converted to HEF-2. The report for October observed that the new thermal system set a new production record; that pure pentaborane yields were the highest to date; that improvements were due to high parity diborane and operational refinements. The report for November stated that a new shipping record was established; that a development program was progressing satisfactorily; that as a result of improved operation, an improved yield was obtained; that a new pentaborane production record was achieved; and that the alkylation area continued to be *407 trouble free. Never once was there tbe slightest suggestion in any of these reports (or in any other contemporaneous document) of any pressure being brought to bear upon plaintiff by the Air Force through delay in formalizing the requested time extension or otherwise.
The record, in sum, shows that despite plaintiff’s promise to deliver the fuel six months earlier than the other bidder and despite the fact that this was an important consideration in the Air Force’s decision to award it the supply contract, plaintiff’s actual schedule of deliveries fell far behind what it had originally proposed and what the contract required. The record further shows that the Air Force at no time asked for delivery of fuel prior to the contract date; and that far from exerting pressure on plaintiff to expedite deliveries the Air Force exercised extreme forbearance (i) in permitting shipments substantially later than required by the contract schedule, and (ii) in never questioning plaintiff’s proposed delivery extensions or insisting upon any modifications thereto. From all this, it is perfectly clear, as the Board found, that plaintiff was chargeable with knowledge that the requested delivery extensions and the granting thereof were but ministerial formalities. And not only is there no showing that the Air Force’s delay in granting the requests occasioned any pressure whatsoever on plaintiff to accelerate the work, plaintiff has failed, as the Board found, to demonstrate what work, if any, it actually accelerated. What is more, even if it were to be assumed that the Air Force had, in fact, caused plaintiff to accelerate the work to meet its contract requirements, it is difficult to see how plaintiff in the absence of changed circumstances would, in any event, be entitled to compensation for a change under the contract. It would be a novel doctrine indeed to allow a contractor an adjustment under the changes clause for the reason that he was compelled to live up to his contract commitments.
Plaintiff’s last contention is that the rationale of National Presto Industries, Inc. v. United States, 167 Ct. Cl. 749, 338 F. 2d 99 (1964), cert. denied 380 U.S. 962 (1965), requires that it be reimbursed for the unanticipated costs of producing fuel occasioned by the need to develop essential data in *408 the company-owned plant for the Air Force plant when the mutual assumption upon which the supply contract was predicated failed — the mutual assumption assertedly being that confirmation work in the company-owned plant for the Air Force plant would not significantly interfere with fuel production. In National Presto this court held that a fixed-price contract between the government and a contractor should be reformed to require the government to bear an equal share of unanticipated expenses where (i) a mutual mistake had caused the expenses; (ii) the contract did not envisage placing the whole risk of the mutual error on the contractor (since, among other things, the undertaking was, in effect, a new and joint enterprise in which neither party had any real expertise or background rather than a performance contract in which the contractor was an expert promising to perform and taking the whole risk and anxiety of the project off the government’s shoulders); and (iii) the government received a contemplated benefit from the extra work and would have been willing to bear a substantial share of the additional expenses if it had known the true facts from the beginning.[36]
The situation in the present case is far different. In the first place (as previously discussed) there was no mutual assumption of the parties that design work at the company-owned plant for the benefit of the Air Force plant would not interfere with fuel production; at best this was a unilateral assumption on plaintiff’s part. Second, it does not appear from the record that the problems plaintiff encountered at the company-owned plant were of an unanticipated nature or that they were occasioned by the need to develop design data for the Air Force plant. But even if the problems were of an unanticipated kind, the contractor here was the expert on whose expertise the government relied; it entered into the arrangement with its eyes open and voluntarily assumed the risk of shouldering the entire expense under the supply contract — whatever it might be. See Austin Company v. United *409 States, 161 Ct. Cl. 76, 314 F. 2d 518 (1963), cert. denied 375 U.S. 830; Carnegie Steel Co. v. United States, 240 U.S. 156 (1916). There is simply no basis here in the parties’ negotiations or in the transaction as a whole for saying that the Air Force would have been willing to bear any part of an extra expense had it known all the facts at the outset.
Plaintiff’s claim for an equitable adjustment under the supply contract must be denied in full.
APPENDIX A

Pertinent Provisions of Supply Contract

(Contract No. AF 33(600)-33407)
Schedule
Part I — Supplies To Be Furnished
(a) The Contractor shall furnish and deliver to the Government the following articles and reports at the unit and total prices as set forth below:
Item: 1:
63,593 pounds of Propyl Pentaborane (HEF-2)
Fuel which shall conform to the following physical properties:
* * * * *
at a unit price of $74.85 per lb. and at a total price of_ $4,759,936. 05
The Government shall have an option during the life of this contract to purchase an additional 9,637 lbs. at a unit price of $74.85 per lb. and at a total price of_ $721,329.45
Item 2:
Three (3) copies of monthly progress reports in informal letter form outlining the progress made during the reporting period_ No Charge
* * * * *
Part II — Delivery
(a) The work called for in Part I (a) hereof shall be completed and the articles and reports delivered to the Government in accordance with the following schedule:

*410
Months after receipt 6y Con-Pounds tractor of executed contract

Item 1:
2,230 _ 8
4,000 _ 9
5.500 _ 10
6.500 _ 11
7,000 _ 12
8,000 _ 13
8,000 _ 14
8,000 _ 15
8,000 _ 16
6,363 _ 17
In the event the option is exercised under Item 1 1,637 lbs. shall be delivered the 17th month and the remaining 8,000 lbs. the 18th month.
Item 2:
Within ten (10) days after the end of the period to which each report relates.
(b) Notwithstanding the delivery schedule set forth for Item 1 in paragraph (a) above the target date for the completion of the delivery called for by said Item 1 is the end of the 17th calendar month following the month during which the Contractor received an executed copy of this contract. In any event, such delivery shall be completed not later than the end of the 10th calendar month following the date upon which the plant goes “on stream”, which, for the purposes of this contract, shall be deemed to be the date upon which the plant shall have produced 4,800 lbs. of the material called for under Item 1, or not later than the end of the 19th calendar month following the month during which the Contractor received an executed copy of this contract, whichever period is earlier.
m * * * *
GeNeral Provisions
* * * * *
36. Retroactive Price Redetermination After Completion. (1) Because of the nature of the work called for by this contract and the uncertainty as to the cost of performance hereunder, the parties agree that the contract price hereof may be adjusted in accordance with the provisions of this clause.
*411 (2) Within sixty days after the completion or termination of this contract, the contractor will prepare and submit to the contracting officer a revised price proposal for the supplies and services furnished on the contract supported by a cost statement, itemized so far as is practical in the manner prescribed by DD Form 784, together with such other information as may be pertinent in the negotiation for a revised price pursuant to this clause. The contracting officer shall have the right at all reasonable times to make or cause to be made such examinations and audits of the contractor’s books, records, and accounts as he may request.
(3) Upon the filing of the statement and other pertinent information required by paragraph (2) of this clause, the contractor and the contracting officer will promptly negotiate in good faith to agree upon a reasonable revised price for the entire contract which, upon the basis of such statement and other pertinent information, will constitute fair and just compensation to the contractor for the performance of this contract. In determining the extent of any estimated allowance for profit to be taken into account in fixing such revised price, consideration will be given to the extent to which the contractor has performed the contract with efficiency, economy, and ingenuity. In no event shall the revised price exceed the sum of $_ * The revised price shall be evidenced by a supplemental agreement to this contract.
# * i£ $ $
38. Progress Payments. — (a) Progress payments, which are hereby defined as payments prior to acceptance on work hi progress for the Government under this contract, may be made upon the following terms and conditions.
(b) The Contracting Officer may, from time to time, authorize progress payments to the Contractor upon property acquired or produced and services performed by it for the performance of this contract: Provided, that such progress payments shall not exceed 75 percent of the cost to the Contractor of the property and services upon which payment is *412 made, which, costs shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer as being representative of the value of the work already performed: Provided further, that in no event shall the total of unliquidated progress payments (see (e) below) and of unliquidated advance payments, if any, made under this contract, exceed 80 percent of the total contract price of supplies or services still to be delivered.
*****
46. Cont/raotual Contents.
This contract consists of:
(a) A Cover Page DD Form 351 (1 Jun 50);
(b) An Administrative Commitment Document, AFPI Form 6 (27 Jan 54);
(c) A Schedule containing Parts I thru V, on pages la thru lc, DD Form 351-1 (1 Jun 50) ;
(d) The General Provisions, consisting of:
1. Clauses 1 thru 35 on pages 1 thru 11, MCP 71-9 (23 Jan 56),
2. Clause 36 on page 12, MCP 71-607 (21 Mar 56),
3. Clause 37 on page 13, AFPI 3-403.3 (i) (c) (3),
4. Clause 38 on page 14, MCP 71-512 (1 Nov 54),
5. Clause 39 on pages 15 and 16, MCP 71-591 (23 Dec 55),
6. Clause 40 on page 17, MCP 71-592 (12 Oct 49),
7. Clause 41 on page 18, MCP 71-594 (4 Jan 55),
8. Clause 42 on page 19, MCP 71-586 (4 Jan 55),
9. Clauses 43, 44, 45, and 46 on page 20, MCP 71-564B (23 Dec 55);
(e) A Signature Page on page 21, DD Form 351-2 (1 Jun 50).
The rights and obligations of the parties to this contract shall be subject to and governed by the Schedule and the General Provisions. * * *
*413 APPENDIX B

Pertinent Provisions of Facilities Contract

(Contract No. AF 33(600)-33060)
GENERAL Provisions
Í! ‡ ‡
Clause 2 — Facilities to he Provided
A. By the Contractor:
(1) The Contractor shall with due expedition perform the items of work set forth in the Schedule, subject to the approval requirements set forth therein.
(2) The approvals required for the foregoing shall be requested by the Contractor prior to performance; but the Contracting Officer may at his discretion grant such approvals subsequent to performance with like effect as if granted prior to performance. Normally, no item shall be approved for manufacture or acquisition hereunder until it has been determined that a suitable like item cannot be furnished by the Government (Department of the Air Force) out of its Industrial Beserve; however, such requirement can be waived solely at the discretion of the Contracting Officer.
* * * * *
B. By the Government:
(1) The Government shall furnish to the Contractor the existing Government-owned facilities set forth in the Schedule. Such property shall become subject to all the terms and conditions hereof upon receipt thereof by the Contractor unless otherwise provided in the Schedule.
& % i]í #
Clause S — Factual Appendices
Within three months after the date of approval of this contract, and at three-month intervals hereafter during the life of this contract, the Contractor shall submit a list of the facilities provided hereunder and not previously listed, together with a list of any necessary changes or deletions of items on previous lists: Provided, however, that no such lists shall be required for any period in which there have *414 been no additions to or changes or deletions of previous listings. Such lists will be identified as “Factual Appendix A” to this contract or supplements to such appendix. They will contain (1) a summary, by categories, of expenditures to date under this contract, (2) a list of all recoverable items of property provided hereunder for which reimbursement is made hereunder and (3) a list of Government-furnished property provided hereunder and shall be in a form to be agreed upon between the Contractor and the Contracting Officer. Such lists shall be certified as correct by a responsible representative of the Contractor. Upon approval and distribution thereof, such lists shall be considered incorporated herein by reference, it being understood, however, that such lists will be binding upon the parties hereto only to the extent that they do not conflict with the supporting documentation. (See Item 3, Clause 42)
Olause Ji. — Reports To Be Furnished by the Contractor
The Contractor, in so far as it is able, shall furnish the Government, upon written request therefor, such reports, estimates and other information regarding the subject matter of this contract as the Contracting Officer finds necessary and reasonable, including such records and data with respect to such facilities as may be required by the Contracting Officer for industrial planning or other purposes. Requests for such reports, estimates and other information shall set forth the nature of the information sought and the form in which such information is to be furnished.
iji ❖ ❖ ❖ ❖
Clause 6 — Reimbursement
A. The Government will pay to the Contractor upon inspection and acceptance by the Contracting Officer of the items or the work specified in the Schedule, subject to the provisions of Paragraph C of this Clause, the direct costs, hereinafter referred to as “Allowable Costs”, and the overhead designated in the Schedule, determined in accordance with Parts 2 and 6, Section XV of the Armed Services Procurement Regulation for items other than construction, and *415 in accordance with. Parts 4 and 6 of said Section XV for items of construction, if any.
* * * * *
C. Once each month (or at more frequent intervals, if approved by the Contracting Officer) the Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as such representative may require, an invoice or public voucher supported by a statement of cost incurred by the Contractor in the performance of this contract and claimed to constitute Allowable Cost and reimbursable overhead. Each statement of cost shall be certified by an officer or other responsible official of the Contractor authorized by it to certify such statements. As promptly as may be practical after the receipt of each invoice or voucher and statement of cost, the Government shall, except as hereinafter provided, make payment thereon as approved by the Contracting Officer. Such payment may include progress payments made to subcontractors or suppliers for machine tools and construction projects ordered hereunder in those cases where the subcontractor or supplier requires progress payments therefor and the subcontract or purchase agreement therefor contains a progress payments clause approved in writing by the Contracting Officer. At any time or times prior to final payment under this contract the Contracting Officer may cause to be made such audit of the invoices or vouchers and statements of cost as shall be deemed necessary. Each payment theretofore made shall be subject to reduction to the extent of amounts included in the related invoice or voucher and statement of cost which are found by the Contracting Officer on the basis of such audit not to constitute Allowable Cost and reimbursable overhead, and shall also be subject to reduction for overpay-ments or to increase for underpayments on preceding invoices or vouchers. The Contractor shall repay to the Government, at any time requested, any overpayment theretofore made.
D. There has been allotted for the performance of this contract the total sum set forth in the Schedule. This sum may be increased from time to time by the Government *416 solely at its discretion. Upon the making of any such increase the Contracting Officer shall amend this contract accordingly. If at any time the Contractor has reason to believe that the amount to be expended or committed by it in the next succeeding 30 days, when added to all previous expenditures and commitments, will exceed 75% of the sum allotted for this contract, it shall notify the Contracting Officer to that effect, giving an estimate as to the percentage of completion of the items of work set forth in the Schedule, so that a determination may be made as to whether or not additional funds will be allotted for this contract. Anything in this contract to the contrary notwithstanding, the Government shall not be obligated to pay to the Contractor either for reimbursement of expenditures or otherwise any amount in excess of the sum allotted for this contract and the obligation of the Contractor to proceed with the performance of this contract shall be limited accordingly: provided, however, that if the Contractor makes any expenditures for which funds are not allotted the Contracting Officer may ratify such expenditures when funds are allotted.
* # * * *
F. The Contractor represents that the costs to be incurred and for which it will be reimbursed under this contract are not and will not be included as an element of cost in any other contracts with the Government or suppliers of the Government and that the overhead rate or rates set forth in the Schedule do not include any allowance for profit.
$ $ $ $ $
Clause 8 — Inspection and Access
A. All work required under this contract shall be executed in the most economical and workmanlike manner in strict conformity with the best standard practices and all material, workmanship and facilities shall be subject to inspection and test by representatives of the Government.
B. The Government shall at all reasonable times have access to the premises wherein any of the facilities provided hereunder are located for the purpose of inspecting and inventorying the same, of removing them as authorized here *417 under, or for determining compliance with, the terms of this contract.
* * * *
Clause 10 — Records
A. (1) The Contractor agrees to maintain books, records, documents and other evidence pertaining to the costs and expenses of this contract (hereinafter collectively called the “records”) to the extent and in such detail as will properly reflect all net costs, direct and indirect, of labor, materials, equipment, supplies and services, and other costs and expenses of whatever nature for which reimbursement is claimed under the provisions of this contract. The Contractor’s accounting procedures and practices shall be subject to the approval of the Contracting Officer; provided, however, that no material change will be required to be made in the Contractor’s accounting procedures and practices if they conform to generally accepted accounting practices and if the costs properly applicable to this contract are readily ascertainable therefrom.
(2) The Contractor agrees to make available at the office of the Contractor at all reasonable times during the period set forth in subparagraph (4) below any of the records for inspection, audit or reproduction by any authorized representative of the Department or of the Comptroller General.
(3) In the event the Comptroller General or any of his duly authorized representatives determines that his audit of the amounts reimbursed under this contract as transportation charges will be made at a place other than the office of the Contractor, the Contractor agrees to deliver, with the reimbursement voucher covering such charges or as may be otherwise specified within two years after reimbursement of charges covered by any such voucher, to such representative as may be designated for that purpose through the Contracting Officer such documentary evidence in support of transportation costs as may be required by the Comptroller General or any of his duly authorized representatives.

*418
Clause —Alterations m Contract

The following alterations have been made in the provisions of this contract:
*****
Item 8 — It is agreed that in complying with the requirements of Clause 8 hereof for the submission of a factual Appendix “A”, that the operating units of production equipment may be listed in such appendix, where practicable, without listing the component parts making up such units.
* * i'fi $ *
Schedule
Part 1 — Items of Work (See Clause 2, Paragraph A)
Item 1 — With the prior written approval of the Contracting Officer, accomplish such land improvements; accomplish the design, enginering and construction of such buildings, building installations (non-mechanical) and land installations (on site); accomplish the design and/or acquisition of such machine tools, production equipment, laboratory and testing equipment, furniture and equipment, material handling equipment as is listed in Contractor’s proposal B-999, dated 1 February 1956, amended by Contractor’s Proposal NF 6046, dated 1 June 1956, as approved by the Government, necessary for the establishment of ZIP production facility and such items approved by the Administrative Contracting Officer as reasonable and equivalent substitutions for items so listed.
¡H $ $ ‡ $
Part 2 — Facilities Furnished by the Government (See Clause 2, Paragraph B)
Item 1 — Such Government-owned machinery and capital production equipment (elsewhere herein referred to as “facilities”) as have been or may be furnished to the Contractor by the Government for the production of high-energy fuel (ZIP) at the location designated in Part 3 hereof.
*419 Item 2 — Such Government-owned land at Lewiston, New York, constituting a part of the premises sometimes referred to as the “Lake Ontario Ordnance Works” as are required for the production of high-energy-fuel (ZIP) and are designated by the Contracting Officer as of such times as are agreed to with him.
Part 3 — Location of Facilities:
Government-owned plant, Lewiston, New York, and such temporary locations as may be approved by the Contracting Officer, subject to the following:
(1) One severable prototype test cell is to be located at Contractor’s plant at Buffalo Avenue, Niagara Falls, New York.
(2) The nonseverable facilities to be provided hereunder are to be located only on the premises of the Government plant.
Part 4 — Target Date for Completion of Installation:
The Contractor agrees to use its best efforts to have the facilities provided hereunder installed and/or otherwise prepared for use on or before 15 January 1959.
* * * * *
Part 6 — Funds Allotted to Contract (See Clause 6, Paragraph D)
Thirty-three Million and Five Thousand Dollars ($33,005,000.00).
SUPPLEMENTAL AGREEMENT No. 1 (JUNE 16, 1958)
‡ ‡ $
II. The basic contract as previously amended is hereby supplemented and amended as follows:
(a) Part 1 of the Schedule is amended by revising Item 1 therein to read as follows:
Item 1 — With the written approval of the Contracting Officer, accomplish such land improvements; accomplish the design, engineering and construction of such buildings, building installations (non-mechanical) and land installations (on site) ; accomplish the design and/or ac *420 quisition of such machine tools, production equipment, laboratory and testing equipment, furniture and equipment, material-handling equipment as is listed in Contractor’s proposal B-999, dated 1 February 1956, amended by Contractor’s Proposal NF6046, dated 1 June 1956, and further amended. by Contractor’s Appendix 1, dated 15 January 1958, as approved by the Government, necessary for the establishment of ZIP production facility and such items approved by the Administrative Contracting Officer as reasonable and equivalent substitutions for items so listed.
(b) Part 6 of the Schedule is amended by adding the following thereto:
Pursuant to the provisions of paragraph D of the clause of the general provisions of this contract entitled ‘Reimbursement’ the funds allotted to this contract for the performance of Item 1 of Part 1 of the Schedule will be increased. The additional funds to be allotted for such performance will be committed and obligated in accordance with applicable regulations in an amount sufficient to cover the Government’s obligation to reimburse the Contractor for the cost of facilities and work approved by the Contracting Officer.
(c) Clause 3 (Factual Appendices) of the general provisions is deleted in its entirety.
(d) Clause 4 (Reports to be Furnished by the Contractor) is revised to read as follows:
Clause J — Reports to be Furnished The Contractor shall periodically furnish to the Government, upon written request, AMC Form 87 properly completed to set forth the indicated information regarding the subject matter of this contract, and, insofar as it is able, shall also furnish to the Government, upon written request, such reports, estimates and other information regarding the subject matter of this contract as the Contracting Officer finds necessary and reasonable, including records and data with respect to such facilities required by the Contracting Officer for industrial planning or other purposes. Requests for such reports, estimates and other information shall set forth the nature of the information sought and the form in which such information is to be furnished.
*421 SUPPLEMENTAL AGREEMENT No. 2 (AUGUST 18, 1958)
II. The basic contract, as heretofore amended, is further amended and supplemented as follows:
(a) By adding the following new Item 6 to Part 1 of the Schedule:
Item 6 — With the written approval .of the Contracting Officer, acquire such material-handling equipment as is listed in Contractor’s proposal B-999, dated 1 February 1956, as amended by Contractor’s Appendix II, dated 2 July 1958, as approved by the Government and as revised with the approval of the Contracting Officer for the purpose of making reasonable and/or equivalent substitutions therein.
(b) By adding the following to Part 4 of the Schedule:
“The Contractor agrees to use its best efforts to have the facilities provided hereunder available for use on or before 1 January 1959.”
Supplemental Agreement No. 8 (March 18, 1959)
* * ❖ ❖ íli ‘
II. The basic contract, as previously amended, is hereby amended and supplemented as follows:
;¡í
(b) By deleting subparagraphs (1) and (2) of Paragraph A of Clause 2 (Facilities to be Provided) and inserting in lieu thereof the following:
(1) The Contractor shall, subject to the terms and conditions of this contract, promptly perform the work specified in the Schedule. The Contractor shall give the Contracting Officer notice in writing of the date on which any work for the design, fabrication, purchase, construction or other acquisition or the repair or rehabilitation of any item of industrial facilities is to commence or subcontract for such work is to be placed. Such notice shall be given at least thirty (80) days, or such longer period as possible, prior to commencement of such work or the placement of such subcontract. The Contracting Officer may, in writing, waive such notice or agree to a different period of notice as to any individual subcontract or item or items of facilities work.
*422 APPENDIX C

Pertinent Provisions of Operating Contract

(Contract No. AF 33 (600)-35077)
GENERAL PROVISIONS
H» V *f*
3. Limitation of Cost.
(a) It is estimated that the total cost to the Government, inclusive of any fixed fee, for the performance of this contract will not exceed the estimated cost and fixed fee set forth in the Schedule, and the Contractor agrees to use its best efforts to perform the work specified in the Schedule, and all obligations under this contract within such estimated cost. The fixed fee for complete performance of this contract is specified in the Schedule.
(b) The sum presently available for payment and allotted to this contract, the item covered thereby and the period of performance which it is estimated the allotted amount will cover, are specified in the Schedule. It is anticipated that from time to time additional funds will be allotted to this contract up to the full estimated cost including any fixed fee. When additional funds are allotted from time to time for continued performance of the work, the parties shall agree as to the applicable estimated period of contract performance which shall be covered by such funds and the contract Schedule amended accordingly. The Contractor agrees to perform or have performed work on this contract up to the point at which, in the event of termination of this contract for the convenience of the Government pursuant to the clause of this contract entitled “Termination”, the total amount paid and payable by the Government pursuant to any settlement including cost and fixed fee under paragraph (e) of such clause would, in the exercise of reasonable judgment by the Contractor, approximate the total amount at the time allotted to this contract. The Contractor shall not be obligated to continue performance of the work beyond such point.
*423 (c) The Government shall not be obligated to reimburse the Contractor for costs incurred (including amounts payable in respect to subcontracts and termination settlement costs) and to pay any fixed fee to which the Contractor may be entitled, in excess of the total amount from time to time allotted to this contract. However, when and to the extent that the total amount allotted to this contract has been increased, any costs incurred by the Contractor and any fixed fee to which the Contractor may be entitled, prior to the increase and in excess of the amount previously allotted, shall be allowable to the same extent as if such costs had been incurred and fee earned after such increase in amount allotted.
$ * $ $ $
4. Allowable Oost, Fixed Fee and Payment.
(a) For the performance of this contract, the Government shall pay to the Contractor the cost thereof determined by the Contracting Officer to be allowable in accordance with Part 2 of Section XV of the Armed Services Procurement Regulation as in effect on the date of this contract and the Schedule (hereinafter referred to as “Allowable Cost”), plus such fixed fee, if any, as may be provided for in the Schedule.
(b) Once each month (or at more frequent intervals, if approved by the Contracting Officer) the Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as such representative may require, an invoice or public voucher supported by a statement of cost incurred by the Contractor in the performance of this contract and claimed to constitute Allowable Cost. Each statement of cost shall be certified by an officer or other responsible official of the Contractor authorized by it to certify such statements.
(c) As promptly as may be practicable after receipt of each invoice or voucher and statement of cost, the Government shall, except as hereinafter provided and subject to the provisions of paragraph (d) below, make payment thereon as approved by the Contracting Officer. * * *
*424 Schedule
Part I — Statement of Work
(a) The Contractor shall, within the period of time specified in Part II hereof, furnish the services and.deliver to the Government the fuel and reports hereinafter described:
Item 1 — Contractor shall furnish and deliver to the Government 297,934 pounds of HEF-2 and HEF-3 fuel in accordance with the requirements of Exhibit 5138-A, dated 18 November 1957, attached hereto and hereby made a part hereof. The target ratio of fuel produced shall be 46% HEF-2 and 54% HEF-3. The Contractor shall perform prepro-duction work necessary for the production of the above fuel including but not limited to the following:
a. Recruitment and Training of Personnel
b. Pre-production Raw Materials
c. Pre-production Engineering
d. Plant Start-up
e. Operation of a Prototype Electrolytic Cell
Item 2 — Four (4) copies each of monthly progress reports containing a brief summary of work accomplished during the previous month, problems encountered, unusual developments and the estimated percentage of contract completion.
# Hí ❖ ❖
Part Till — Allowable Cost
Allowable cost under paragraph (a) of Clause 4 of the General Provisions shall include:
5,5 ífí j{{ 5j> Sji
(g) Cost of production engineering and of process improvements or modifications for the purpose of effecting a more efficient or economical operation.
. (1) Cost of operating the prototype cell located at the plant of Olin Mathieson Chemical Corporation, Buffalo Avenue, Niagara Falls, New York, and covered by Facilities *425 Contract AF 33 (600)-33060, for a maximum six and a half (6.5) months total operating time. The Contracting Officer shall determine (within the limitation of six and a half (6.5) months) when such data are available so that operating may be stopped earlier.
❖ $ $ $ $

The opinion and recommended conclusion of law are submitted pursuant to the order of the court under Rule 57(a). The facts are stated in the opinion.

 The record before tbe Board is voluminous, confusing and exceedingly complicated with much of plaintiff's proof before tbe Board consisting of highly technical evidence to show how the work performed at the company-owned plant benefited the Air Force plant. Withal, the basic facts in the record are free of any significant dispute by the parties themselves, except as to their ultimate meaning and bearing on plaintiff’s claims. The facts contained in this opinion are derived from unchallenged facts in the Board opinion and from undisputed evidence — primarily of a documentary nature — in the Board record. Some facts set out by the Board to which plaintiff takes exception are contrary to the undisputed evidence before the Board (though such facts largely concern matters not relevant to the basic issues in the case). Appropriate factual findings — where relevant — have been made here in such instances on the basis of the undisputed evidence before the Board. See e.g., Gholson, Byars and Holmes Constr. Co. v. United States, 173 Ct. Cl. 374, 388, n. 7, 351 F. 2d 987, 995, n. 7 (1965).

 Defendant in its brief asks the court to supplement the administrative record by taking judicial notice of certain statements made by plaintiff in its annual reports and a Prospectus for the sale of debentures in 1957, which documents, it says, are on file with, and available to the public in, the offices of the Securities and Exchange Commission. Defendant offers this matter not for the purpose of showing that such documents were filed with the SEC, but as proof for an argument it makes concerning plaintiff’s motive in constructing its high-energy fuel plant. Such materials do not constitute matters of common knowledge so as to be appropriate for judicial notice. See Wigmore Evidence (3d ed.) §§ 2571-82; McKelvey Evidence (5th ed.) §§ 22-39. And even if the contrary were assumed to be true, judicial notice at the appellate level should not be used to raise controversies not presented by the record. Mutual Life Ins. Co. v. McGrew, 188 U.S. 291, 312 (1903); Arkansas v. Kansas & Texas Coal Co., 183 U.S. 185, 190 (1901); Mountain View Mining & Milling Co. v. McFadden, 180 U.S. 533, 534 (1901). Eor the fact that a matter is judicially noticed may not prevent the opposing party “from disputing the matter by evidence, if he believes it disputable.” Wigmore, op. cit. supra, § 2567 at p. 535. See also Ohio Bell Telephone Co. v. Public Utilities Comm., 301 U.S. 292 (1937); United States v. Aluminum Co. of America, 148 F. 2d 416, 446 (2d Cir., 1945) ; Wigmore, op. cit. supra, § 2565. In these circumstances not only is the matter thus offered by defendant untimely, it is potentially prejudicial since opportunity for rebuttal would be precluded. Defendant also asks that judicial notice be taken of certain facts relating to the history of the manufacture of certain chemicals, apparently to dispute the testimony of an expert witness before the Board who was subject to cross-examination. Such material, too, is neither appropriate for judicial notice (wigmore, op. cit. supra, § 2580; 20 Am. Jur. Evidence § 97 at p. 112) nor available for consideration at the appellate level. Eor these reasons, the data offered by defendant for judicial notice is stricken and totally disregarded. Defendant’s brief, it may be added, fails to deal with many of the pertinent issues presented by plaintiff’s claims.

 The plant operated on' the basis of using lithium hydride and boron trifluoride to produce diborane which subsequently by pyrolysis (i.e., decomposition by heat) was converted to pentaborane and then purified.

 Capacities here are expressed in the common denominator of diborane except for the Air Force 5-ton per day plant which is expressed in terms of end-product. The diborane production capacity of the 5-ton per day plant was 16,400 pounds per day.

 In connection with the development of the batch process method, plans were to construct a government-owned “Interim Pilot Plant” with a 1600-pound per day capacity. It was planned that this plant would be the source of HEF necessary for further testing and development of production facilities, the fuel itself, and certain engines, ultimately, plaintiff was awarded a contract by the Navy to build the Interim Pilot Plant. Eighty percent (80%) of the funds for this contract were furnished by the Air Force, with the balance furnished by the Navy.

 Plaintiff says, and the undisputed testimony so shows, that conservative engineering practice for industrial chemical process design generally dictates that a scale-up from pilot plant data to a commercial production plant should be kept within the order of about ten times. The proposed 5-ton per day plant (with a daily capacity of 16,4,00 pounds of diborane) was over 400 times larger than the next largest existing plant capable of demonstration of essential data, i.e., the 40-pound per day pilot plant.

 Though the record Is unclear, there appears to be no relationship for purposes of this case between plaintiff’s proposal to the Air Force for construction of a 250-pound per day interim pilot plant and plaintiff’s contract with the Navy for the construction and operation of the 1,600-pound per day Intermediate Pilot Plant. See note 5, supra.

 Plaintiff’s price proposal for the supply contract -was much higher than the other bidder’s, when this was pointed out to it by the Air Force, plaintiff explained that the proposed company-owned plant was important in obtaining data for the design and construction of the Air Force plant. During the negotiations, plaintiff lowered its offered price, but its price was still substantially higher than its competitor’s. Plaintiff’s proposal, however, called for deliveries six months earlier than the other bidder’s.

 More particularly, the research and development contract required plaintiff to furnish all services, facilities, materials and equipment and accomplish modifications as necessary for the development of a commercially feasible continuous process for producing' diborane and the subsequent conversion to high-energy fuel, with the investigation to he directed toward obtaining data required for the efficient engineering, design and operation of the 5-ton per day production plant. To this end, the contract required plaintiff to design, engineer, purchase, fabricate, install, operate and modify, as necessary, pilot plant facilities. Results from the performance of this research were to be available for use on the supply contract, but no work was to be initiated under the research and development contract which was for the prime purpose of supporting the company-owned plant. The provision summarized in this last sentence was initially proposed by the Air Force. Plaintiff’s technical proposal to the Air Force (NF-6430) indicated it construed that provision to mean that the time its engineers spent at the company-owned plant in obtaining engineering and operating data for the 5-ton per day plant would be a direct charge under the proposed research and development contract. The contract as ultimately approved specified that the provision in question was “applicable to this contract to the extent indicated in Proposal NF-6430.”
Prior to entering into the research and development contract, plaintiff, in response to an Air Force inquiry as to the estimated cost of pilot plant facilities it would absorb, advised the Air Force that it was, among other things, building a company-owned pilot plant estimated to cost $3',600,000 to produce fuel under the supply contract and that this pilot plant was an essential part of its process development program and an essential precursor to the Air Force 5-ton per day plant.

 This contract tvas an outgrowth of a proposal (NE-6951) made by plaintiff in December 1956 for. operation of the Air Force plant. In its proposal, plaintiff pointed out the following as to why it should be granted favorable consideration: “Additionally, Olin Mathieson has a very considerable investment in this entire program which merits recognition. For approximately three and one-half years it performed supporting R and D work on a no-fee basis, despite a large commitment of company-owned facilities and technical staff to the program. More recently it has undertaken construction of an intermediate-size, company-owned pilot plant that will cost approximately $3,600,000, to advance the program more rapidly toward production and use goals. The construction of the [Air Force] 5- T/D plant also will be without fee. All the foregoing activities have entailed a large-scale and long-term involvement of company funds and of company personnel with scarce engineering, technical, and managerial skills that otherwise would be available for productive employment in other areas of interest and value to Olin Mathieson.”

 under plaintiff’s proposal, a prototype electrolytic cell was to be operated for a period of 6% months with the work thereon to be done at plaintiff’s company-owned plant. In accordance with this proposal, the cost of operating the prototype cell at the company-owned plant was specifically included in the operating contract as an allowable cost. This provision was a corollary to a provision in part 3 of the facilities contract schedule which specified that a severable prototype test cell was to be located at the company-owned plant.

 In March 1958 plaintiff submitted a revised estimate indicating that $46,547,454 would be required to complete the Air Force plant rather than $33,005,000 as originally estimated.

 The initial target date for completion of the plant was January 15, 1959, which was later changed to January 1, 1959. After the termination notice, the Air Force instructed plaintiff, in September 1959, to immediately shut down and prepare for disposal all parts of the Air Force plant except for one area which was to continue in operation under the operating contract to produce 600,000 pounds of boron-trichloride by mid-December 1959.

 After the company-owned plant had been in production for about a year, plaintiff, on October 16, 1958, wrote the Air Force that on the basis of its experience in the operation of the company-owned plant it anticipated difficulty in attaining the required production from the Air Force plant within the schedule called for by the operating contract; that more pilot plant work was necessary if the production forecast was to be met; that in addition to the funds supplied by the Nayy and Air Force, plaintiff had already invested $10,000,000 of its own money in solving a number of the problems pertaining to the manufacture of boron fuels; and that the technical information and experience gained from the company-owned plant had been used in the design of the Air Force plant. In these circumstances, plaintiff recommended (i) that the company-owned plant be used primarily for such pilot plant work, with product output from the company-owned plant considered as subordinate; (ii) that the supply contract be terminated; and (iii) that the company-owned plant be operated on a cost-plus-fixed-fee basis (with depreciation for that plant allowed as a direct cost). The proposal was discussed with the Air Force which determined that it was unnecessary to terminate the supply contract in order to accomplish the support work necessary for the start-up of the Air Force plant. Plaintiff then submitted a revised proposal (OM — 183-1) for a development support program for the Air Force plant in which it recommended performance of seven technical tasks, some of which it indicated would be performed in the company-owned plant without hindering production *381 in that plant. Plaintiff’s proposal was authorized (with minor modifications) by the Air Force which wrote the plaintiff in December 1958 that “It is agreed the contractor must perform tasks in the following (specified] areas of * * * [its] proposal to alleviate problem areas in * * * [the operating contract] * * * The letter from the Air Force to plaintiff continued: “The above authorized work is considered within the scope of * * * [the operating contract] and is considered necessary to adequately perform according to the terms and conditions of said contract, and since * * * Proposal OM-183-1, No work over and above contractual requirements is contemplated, no fee other than that already specified can be paid on these tasks as quoted by contractor in subject proposal, [sic] Since no contractual changes are necessary, contractor should proceed in these areas at the earliest possible date.”

 In its claims submission to the contracting officer, plaintiff indicated that construction of the company-owned plant cost about $6,200,000 (rather than $3,600,000 as orginally estimated) ; that the salvage value of the plant was $730,000 ; that the plant was operated for 23 months at a cost of $8,839,308, excluding depreciation; and that its sales revenue from materials supplied to the government and other customers was $7,958,271. On this basis, plaintiff incurred a loss of $6,351,037 in respect of the company-owned plant.

 The total contract price paid to plaintiff under the supply contract, as modified, was $7,292,983.52, representing a total contract target price of $6,292,285.50 and a total upward revision of about $1,000,000.

 In this connection the Board stated: “It is not unusual for contractors to enter into occasional cost-sharing arrangements with the Government. This type of arrangement is peculiarly apropos to the early stages of research and development on a new program. Incentive to entering such an arrangement generaUy lies in the contractor’s expectation of a concurrent or future commercial application of the data and know-how obtained. * * * Even where no commercial application is envisioned, the possibility of competitive advantage in obtaining Government contracts can play a decisive part in a decision to share the cost. Such competitive advantages, entirely ethical, although possibly undesirable from the Government’s point of view, might include becoming a sole or key source where the investment is so large and requirements so small that development of multiple sources is uneconomical, or becoming a ‘lead’ contractor. * * * [Plaintiff] testified that although the * * * [company-owned] plant was built to produce for the supply contract over a period which would not result in amortization of plant construction costs, the record shows that it hoped for future use in producing HEE-3 and HEE-4, with some plant modifications.
“The clearest kind of cost-sharing arrangements,” the Board continued, “is a single cost-sharing contract. This type of contract is little used. However, other devices for cost-sharing are not unusual. It is common knowledge that contractors, on occasion, take fixed-price contracts upon a no-profit or loss basis when this action is deemed to be of long-run benefit to them.”

 With the two exceptions that follow, plaintiff does not take issue with the foregoing findings of the Board. Plaintiff challenges the finding that the contract award action of the Board was based upon a proposal by plaintiff to operate its company-owned plant at no expense to the government. This is considered below. Plaintiff also disputes the finding that the close-down of the Air Poree plant a week or two before it started production signaled the end of any large-scale supply of fuel from the company-owned plant. The record shows that the ending of production at the company-owned plant was due to the government’s curtailment of the high-energy fuel program rather than the close-down of the Air Poree plant.

 The exception related to a prototype electric cell which plaintiff was authorized by part 3 of the facilities contract schedule to have located at the company-owned plant. Correspondingly, Part VIII (1), of the operating contract allowed as a cost under that contract plaintiff’s cost of operating this cell for a maximum of 6% months. See note 11, supra.

 The circumstances (including the preliminary negotiations) under which the interrelated contracts here involved were signed are admissible to determine whether or not there was such an understanding of the parties, particularly since the formal contracts did not (as the record malees clear, e.g., tr. 158-59) contain the complete statement of the parties’ agreement. Wil-liston Contracts (3d ed.) § 636; Corbin Contracts, § 586, pp. 498-501. This court must put itself in the same position as the parties occupied at the time the contracts were made and view the circumstances as the parties viewed them — not for the purpose of changing the written contracts but to ascerain their actual significance. Williston, § 629; Restatement, Contracts, § 235 and comment on clause (d) ; Corbin, § 543'. Plaintiff’s position as to the applicability of the parol evidence rule is somewhat inconsistent. On the one hand, it argues that the parol evidence rule bars consideration of the circumstances surrounding formation of the contracts in issue to determine whether there was such an understanding, yet insists that the Board was correct in looking to these self-same circumstances to find that the parties intended the company-owned plan to have a dual purpose.

 The actions and conduct of the parties in performing a contract are highly relevant in determining what the parties intended. See e.g., Northbridge Electronics, Inc. v. United States, 175 Ct. Cl. 426, 438, n. 8 (1966); Jansen v. United States, 170 Ct. Cl. 346, 354-55, 344. F. 2d 363, 369 (1965) ; Universal Match Corp. v. United States, 161 Ct. Cl. 418, 422 (1963) and cases cited in n. 4.

 The testimony before the Board of a vice president of plaintiff (who had supervisory responsibility for the company’s high-energy fuel program) malees clear that plaintiff’s proposal to the Air Force contemplated that the company would pay out of its own funds the cost of building the company-owned plant and the cost of obtaining data from it for the benefit of the Air Force plant. Thus in referring to the company-owned plant the witness testified : “I am talking about the company-owned pilot plant which we proposed to build with company funds to supply the fuel and the data indicated [for the Air Force plant].” Tr. 89. See also tr. 88, 99.

 Further, clause 3 of the facilities contract required plaintiff to submit each three months a list of the facilities provided under the contract, which list was to contain a summary, by categories, of expenditures to date under the contract. There is nothing in the record to show that plaintiff included in the lists thus submitted the costs claimed here.

 Item 1 of the “Items of Work’’ provision of the facilities contract schedule provided: “With the prior written approval of the Contracting Officer, accomplish such land improvements; accomplish the design, engineering and construction of such buildings, building installations (non-mechanical) and land installations (on site) ; accomplish the design and/or acquisition of such machine tools, production equipment, laboratory and testing equipment, furniture and equipment, material handling equipment as is listed in Contractor’s proposal B-999, dated 1 Febrary 1956, amended by Contractor’s Proposal NF6046, dated 1 June 1956, as approved by the Government, necessary for the establishment of ZIP production facility and such items approved by the Administrative Contracting Officer as reasonable and equivalent substitutions for items so listed.”

 Plaintiff argues that item 1 of the “Items of Work” provision of the facilities contract schedule required prior written approval for “land improvements” only and did not require prior approval for “design of * * * production equipment.” This construction would seem contrary to the clear language of the provision. The provision, it may be added, developed this way. In plaintiff’s proposal for the facilities contract (B-999, as amended by proposal NF-6046), plaintiff set forth a list of items of work required and the estimated cost for each. The items thus set out included “land Improvements,” “buildings,” “building installations (not mechanical),” “land instaUations (on-site),” “machine tools, production equipment, building installations (mechanical),” “laboratory and testing equipment,” “miscellaneous furniture and equipment,” and “material handling * * * vehicles.” In turn, item 1 of the “Items of Work” provision of the facilities contract simply listed seriatim the items thus listed in the contractor’s amended proposal as approved by the government. In this context it is apparent that the written approval of the contracting officer was required for all items thus listed in plaintiff’s amended proposal — .not simply for “land improvements” alone. In support of its argument that Air Force approval was not required, plaintiff points to testimony on cross-examination by an Air Force project officer in charge of contracting for the Air Force plant facilities to the effect that under the facilities contract plaintiff had the responsibility to go ahead and design a plant as necessary and that “it was within that scope of the work that he had complete freedom to go ahead with his design.” Tr. 492-23. It may be noted that the witness further testified that he was only concerned with process design insofar as it affected the final completion date of the Air Force plant and that he relied for technical guidance upon the head of the Air Force Propulsion Laboratory who had primary responsibility for the entire development program. In passing, it is difficult to understand why the witness would have even needed technical guidance if plaintiff had the carte blanche authority it claims it had to go ahead with the design work without concurrence of the Air Force. Be that as it may, the testimony of plaintiff’s director of engineering (who had responsibility for supervising all operations of plaintiff’s high-energy fuel facilities) makes it clear that Air Force approval was, in fact, continuously required. Thus, he testified that he and his associates had monthly meetings with various Air Force representatives, including the contracting officer, which covered the “progress of problems * * * [at] the [company-owned] plant and the five-ton per day * * * [Air Force] plant in all aspects of engineering, design, procurement, operation, and the various aspects of the required, paper work and, approvals and so forth.” [Tr. 387-88.] [Emphasis supplied.]

 This proposal was submitted several months before the company-owned plant proposal was conceived and submitted to the Air Force and, of course, made no reference to it.

 Proposal NF-6046 was submitted contemporaneously with the supply contract negotiations.

 Plaintiff Ras received payment under the operating contract for the work incurred at the company-owned plant thus authorized under proposal OM-183-1 and the present claim does not involve such costs.

 On one occasion, the time extension was not granted until more than three months after the reguest; on another occasion, about four months elapsed.

 There seems to be a basic inconsistency in plaintiff’s argument under the changes claim as contrasted with its argument under the cost-allowance claims. In insisting it is entitled to an equitable adjustment for a change, plaintiff says: “The fact is that the Air Force paid a substantially higher price for production of fuel by a continuous process over what a batch process would have cost, because of the necessity of having confirmation data for the [Air Force] 5 T/D plant from a pilot plant of intermediate size such as the COP [company-owned plant].” Despite this clear statement that the Air Force has already paid for this confirmation data (through the medium of a higher price under the supply contract than would otherwise have been the case), plaintiff in its cost-allowance claims insists that the Air Force should again pay it under the facilities and operating contracts for the costs of the confirmation data.

 Plaintiff, in addition, reported to the Joint Working Group on Special Fuels on October 29 and 30, 1957: “As indicated earlier in this presentation, the chemistry of the process has been demonstrated. However, when starting operation of a new plant it is expected to have operational difficulties. The major portion of the difficulties experienced and overcome at COP [the company-owned plant] has been mechanical. As a result, know-how has been obtained with an actual operating unit on a day-to-day basis. Much of this *402 valuable experience and information on the plant operation, as well as design modification, is applicable to' the Navy and Air Force plants.”
In November 1958, plaintiff wrote the Air Force: “During the start-up and subsequent operation of the Company-Owned Plant * * * many operational and technical problems were encountered and overcome. Although it was not possible to foresee all of the potential problems from previous laboratory and pilot-plant work, many were recognized and * * * [the plant was] designed with the flexibility required to minimize as many of these problems as possible.”

 The operating factor of a plant is the percentage relationship between the time a plant is in operation as compared to the total time available for operation. The converse relation is downtime, i.e., the amount of time the plant is down for maintenance, repairs and modification as compared to the total amount of time available for operations. The record here shows that the company-owned plant was designed on the basis of an overall operating factor of 83 percent; that such an operating factor was á reasonable one; and that the actual overaU operating factor was considerably less than that. The Board’s finding in these circumstances that an operating factor of 83 percent was not applicable to the type of work plaintiff undertook in the company-owned plant is contrary to the undisputed evidence. The fact, however, that the operating factor was considerably less than 83 percent or conversely that the downtime exceeded 20 percent would scarcely seem relevant, particularly since plaintiff has failed to demonstrate that such downtime was occasioned by unanticipated circumstances or the need to develop design data for the Air Force plant. The record, in fact, indicates that a major part of the excess downtime was due to the strike, the unavoidable waiting for feed materials, company errors, and an effort to optimize plant operations.
Plaintiff further claims that the excess downtime could have been avoided if the company-owned plant had been converted in 1958 from a continuous process method to a batch process method to meet the production requirements of the supply contract. It states that the batch process method was sub *404 stantially less expensive but that If that alternative had been followed, the essential design data for the Air Force plant would not have been attained. Apart from the relevance of this contention, it is subject to the infirmities that plaintiff had proposed the continuous process method for the company-owned plant; it received a price under the supply contract which it proposed as a fair price for the continuous process method; and it never proposed converting the plant to the batch process method.

 The supply contract, as previously mentioned, called for total deliveries of 68,593 pounds of fuel.

 None of plaintiff’s requests for time extensions indicated that delay in the production of fuel at the company-owned plant was occasioned by a need to develop in that plant design data for the Air Force plant.

 The strike at the plant was settled on August 9, 1958, and a period of about nine days after that was required to get the plant fully started up. Shipments in August aggregated 148 pounds of fuel.

 For comment on the National Presto ease see 65 Colum. L. Key. 542 (1965) ; 33 Fordham L. Key. 507 (1965) ; 53 Geo. L.J. 826 (1965) ; 114 U. Pa. L. Key. 306 (1965).

 $6,085,860.10; however, if the Government exercises its option for the additional quantity of fuel under Item 1, then the amount shall be $6,482,319.60.